## In re PETTERS COMPANY, INC., et al., Debtors.

(includes Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc.; Edge One LLC; MGC Finance, Inc., PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).

Nos. 08–45257, 08–45258(GFK), 08–45326(GFK), 08–45327(GFK), 08–45328(GFK), 08–45329(GFK), 08–45330(GFK), 08–45331(GFK), 08–45371(GFK), 08–45392(GFK).

United States Bankruptcy Court, D. Minnesota.

March 10, 2010.

---

20. *In re Ladd,* 450 F.3d at 755.

James A. Lodoen, Jeffrey D. Smith, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Petters Co., Inc.

## ORDER RE: DISPUTED ELECTION FOR TRUSTEE IN CASE OF DEBTOR PETTERS GROUP WORLDWIDE, LLC

GREGORY F. KISHEL, United States Bankruptcy Judge.

This group of cases is presently pending under Chapter 11.[1] The cases are being jointly administered pursuant to an order entered on October 22, 2008. Douglas A. Kelley has served as trustee in all of them, under an appointment by the United States Trustee that the Court approved in an order entered on February 26, 2009.[2]

The specific proceeding at bar was initiated by four related entities scheduled as creditors in the case of Debtor Petters Group Worldwide, LLC ("PGW")—Ritchie Capital Structure Arbitrage Trading, Ltd.; Yorkville Investment I, L.L.C.; Rhone Holdings II, Ltd.; and Ritchie Special Credit Investments, Ltd. (collectively "Ritchie"). On December 29, 2008, they had filed a request to the United States Trustee under 11 U.S.C. § 1104(b)(1), that a meeting of creditors be convened in that case alone, for the purpose of electing a trustee for that one debtor's estate.[3] Under a notice filed on March 27, 2009, the United States Trustee scheduled a meeting of creditors for that purpose.

The notice was sent to creditors and other parties in interest. The U.S. Trustee convened the meeting on April 22, 2009. Six creditor groups or individual creditors appeared and participated. On the request of Ritchie and another creditor, procedures under the law governing a trustee election were initiated and a record was made.

After the meeting was adjourned, the U.S. Trustee filed a report of the election pursuant to FED. R. BANKR. P. 2003.[4] In it, the U.S. Trustee noted that two parties appearing at the meeting had cast ballots in favor of Timothy D. Moratzka, Esq., a member of the panel of Chapter 7 trustees for this district. The U.S. Trustee concluded that the election was disputed within the meaning of FED. R. BANKR. P. 2003(d)(2); he cited the status of the bal-

---

1. The group will be termed "the Petters-related cases." Three different collections of pending bankruptcy cases are in the mix for the present dispute.

2. This Court's order is reported at 401 B.R. 391 (Bankr.D.Minn.2009). The District Court's affirmance is reported at 415 B.R. 391 (D.Minn.2009). An appeal is presently pending in the Eighth Circuit.

3. Ritchie's request was timely-made under § 1104(b)(1) and FED. R. BANKR. P.2007.1(b)(1), i.e., it was filed and transmitted to the United States Trustee not later than 30 days after December 17, 2008, when the Court had ordered the appointment of a trustee or trustees.

4. The report was docketed on May 20, 2009.

loting, the pendency of filed objections to claims in the PGW case, and positions voiced by various parties who had appeared. On his analysis, the U.S. Trustee submitted that an insufficient number of creditors that were qualified to vote under 11 U.S.C. § 702(a) had requested that an election be conducted; therefore, he opined, the "Voting Quorum threshold" of 11 U.S.C. § 702(b) had not been met. As a result, the U.S. Trustee maintained, "a valid election" had not "occurred," and "Douglas A. Kelley remain[ed] the chapter 11 trustee of" PGW.

Ritchie then filed a motion pursuant to FED. R. BANKR.P. 2003(d)(2), for resolution of the dispute reported by the U.S. Trustee. That motion came on for hearing. Appearances were noted as follows: James M. Jorissen, Esq., and Brian A. McAleenan, Esq., for Ritchie; Michael R. Fadlovich, Esq., and Robert B. Raschke, Esq., for the U.S. Trustee; James A. Lodoen, Esq., for the Chapter 11 trustee; Ronald R. Peterson, Esq., trustee for the Chapter 7 estates of Lancelot Investors Fund, LP, Lancelot Investors Fund II, LP, Colossus Capital Fund, Ltd., Colossus Capital Fund, LP, and Lancelot Investors Fund, Ltd., (those five, collectively, "Lancelot" or "the Lancelot entities"), plus RWB Services, LLC; David E. Runck, Esq., for the Committee of Unsecured Creditors in the Petters-related cases; and Ronn B. Kreps, Esq., for Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. (collectively, "the Palm Beach claimants"). This order addresses the dispute and disposes of Ritchie's motion.

## GOVERNING LAW

Since PGW's case is pending under Chapter 11, the provisions of that chapter are the first source of legal governance for the election of a trustee. For the substance of that governance, however, another provision of the Bankruptcy Code is incorporated by reference:

"The election of a trustee shall be conducted in the manner provided in ... [11 U.S.C. §§ ]702 [ (a), (b), and c] ..."

11 U.S.C. § 1104(b)(1). In turn, §§ 702(a)-(c) provide:

(a) A creditor may vote for a candidate for trustee only if such creditor—

(1) holds an allowable, undisputed, fixed, liquidated, unsecured claim of a kind entitled to distribution under [11 U.S.C. §§ ]726(a)(2), 726(a)(3), 726(a)(4), 752(a), 766(h), or 766(i) ...;

(2) does not have an interest materially adverse, other than an equity interest that is not substantial in relation to such creditor's interest as a creditor, to the interest of creditors entitled to such distribution; and

(3) is not an insider.

(b) At the meeting of creditors held under [11 U.S.C. § ]341 ..., creditors may elect one person to serve as trustee in the case if election of a trustee is requested by creditors that may vote under subsection (a) of this section, and that hold at least 20 percent in amount of the claims specified in subsection (a)(1) of this section that are held by creditors that may vote under subsection (a) of this section.

(c) A candidate for trustee is elected trustee if—

(1) creditors holding at least 20 percent in amount of the claims of a kind specified in subsection (a)(1) of this section that are held by creditors that may vote under subsection (a) of this section vote; and

(2) such candidate receives the votes of creditors holding a majority in amount of claims specified in subsection (a)(1) of this section that are held by creditors that vote for a trustee.

FED. R. BANKR.P. 2007.1(b)(2) transplants more of Chapter 7's apparatus for trustee election,[5] in the form of the following:

> ... a creditor is entitled to vote at a meeting if, at or before the meeting, the creditor has filed a proof of claim or a writing setting forth facts evidencing a right to vote pursuant to [11 U.S.C.] § 702(a) ... unless objection is made to the claim or the proof of claim is insufficient on its face.... In the event of an objection to the amount or allowability of a claim for the purpose of voting, unless the court orders otherwise, the United States trustee shall tabulate the votes for each alternative presented by the dispute and, if resolution of such dispute is necessary to determine the result of the election, the tabulations for each alternative shall be reported to the court.

FED. R. BANKR.P. 2003(b)(3).

These provisions set up two stages of hurdle for a party that seeks to seat a trustee by election. At each stage, creditors must meet certain requirements to participate. To distinguish between the stages, it is appropriate to use different verbs. A creditor would "qualify" to vote under § 702(a), i.e., establish a status as claimant with the qualities specified in the statute. Then a creditor would become "entitled" to vote under Rule 2003(b)(3), i.e., take the additional step of actually filing a proof of claim or equivalent writing, which then is not subject to a pending objection when the meeting of creditors is

convened, if it had not made that filing already.

The language of the governing statutes and rules is cumbersome. It places the very devil into multiple details that are inherent in the position of each creditor that injects itself into the process. Ultimately, the legal tenability of the outcome from an election process can turn on involved creditors' qualification to request an election and their entitlement to vote.

There are several ways in which an analysis of the details could be organized. Here, it seems most appropriate to set out the relevant minutiae for each of the six creditors or creditor groupings that were active in the election process here.[6] Then, each constituency's qualification can be determined, by applying § 702(a) to the characteristics of their claims.

As it turns out, the dispute in the PGW case is resolved with the tally to be made after that, in determination of whether an election was properly called. It is not necessary to get into the issue of entitlement to vote, or a tally of votes made by entitled creditors.

## CHARACTERISTICS AND STATUS OF EACH CREDITOR'S CLAIM

### A. Ritchie

1. The Schedule D filed for PGW's case [7] included separate entries for the four entities that are collectively termed "Ritchie" in this decision. The total amount of the claims was recited at

---

5. The relevant text of Rule 2007.1(b)(2) is: "An election of a trustee under § 1104(b) ... shall be conducted in the manner provided in Rules 2003(b)(3) and 2006."

6. Those for another creditor constituency, one did not appear, are also relevant; but they factor in later in the analysis.

7. The schedules, filed on December 10, 2008, were prepared at the instance of Douglas A. Kelley, under color of his authority as receiver appointed by the United States District Court in connection with the criminal case against Thomas J. Petters. Kelley verified the schedules, under the stated status of "Receiver and Debtor in Possession."

$225,256,470.76. The schedule identified the claims as "unliquidated" and "disputed." The entry also states: "Grant of security interest in trademarks of Polaroid on 9/19/08 and Financing Statement filed." The latter reference is to the Polaroid Corporation (which was one of PGW's subsidiaries), or a business entity related to it.

2. Ritchie later filed proofs of claim in PGW's case. There was a total of four: each one asserted a separate claim, different in amount, for one of the four creditor-entities. All four proofs of claim were filed on April 21, 2009.[8] The total value of the claims recited on the face of these documents is $209,400,314.16.

3. On April 21, 2009, the Unsecured Creditors' Committee for the Petters-related cases filed an objection to Ritchie's claims.[9] The Committee stated that it was objecting "for the purpose of determining Ritchie's eligibility to vote at the meeting of creditors scheduled for April 22, 2009 ..." It expressly challenged Ritchie's capacity to participate in a trustee election process, on the ground that Ritchie held an "interest materially adverse ... to the interest of creditors entitled to ... distribution" in PGW's case, within the meaning of 11 U.S.C. § 702(a)(2). The Committee did not frame up "substantive" objections to the allowance of the claims, i.e., with reference to 11 U.S.C. § 502(b), but it reserved the right to do so later.

4. As to the source of this "materially adverse interest," the Committee relied on certain circumstances in this group of cases and the group of pending bankruptcy cases headed by *In re Polaroid Corp.*, BKY 08–46617 (collectively, "the Polaroid Corporation cases"):

a. The Polaroid Corporation was a subsidiary of PGW, through one or more intermediate holding companies.

b. The bankruptcy estates of PGW and Petters Company, Inc. ("PCI") had asserted claims against the bankruptcy estate of the Polaroid Corporation, based upon documentary evidence of inter-company lending or other transactions that had left unsatisfied debt obligations.

c. The claims of PGW and PCI "represent[ed] in excess of 50% of the total unsecured claims against Polaroid [Corporation]."

d. Ritchie also had filed proofs of claim in the Polaroid Corporation cases, asserting security interests in "substantially all of [their] assets, including trademarks."

e. Most of the assets of the estates in the Polaroid Corporation cases, including trademarks, had been sold at auction in April, 2009. The cash and other value generated from the sale (estimated at approximately $88,000,000.00 in total, at the time of the auction) was significantly less than the total of the debt stated on Ritchie's proofs of claim in either the PGW case or the Polaroid Corporation cases (over $209,000,000.00).

f. In an exhibit attached to its proofs of claim in the PGW case, Ritchie stated: "This is filed as an unsecured claim against Petters Group Worldwide, LLC."

g. The Polaroid Corporation had commenced an adversary proceeding against Ritchie, in the Polaroid Cor-

---

8. This was one day before the noticed date for the meeting of creditors that was to be convened for a trustee election.

9. This objection was filed after Ritchie filed the proofs of claim. (The Committee's objection contains a reference to the proofs of claim being on file already.)

poration's Chapter 11 case. Its pleaded theories of suit relied on one central allegation: through the actions of Thomas J. Petters, the individual in control of PGW and PCI, the Polaroid Corporation had pledged its assets to Ritchie to secure preexisting debt of PGW, PCI, or both; but the Polaroid Corporation itself had not been legally liable on that debt. As plaintiff, the Polaroid Corporation sought various sorts of relief against Ritchie. All of them would lead to the divestment of Ritchie's liens against the assets of the Polaroid Corporation's estate; several would result in the subordination of any monetary claims that Ritchie had in the Polaroid Corporation's case.

h. Ritchie was actively defending the adversary proceeding. In particular, Ritchie was strenuously defending the validity and enforceability of its security interest, and it was using fairly harsh language to impugn the Polaroid Corporation for the pleading of certain of its theories of recovery.

### B. Lancelot

1. The debt schedules filed for PGW's case did not include entries for claims in favor of the Lancelot entities.

2. On April 21, 2009, groups of proofs of claim were filed by a trustee for the bankruptcy estates of the Lancelot entities, all of which were then debtors in liquidation under Chapter 7 in the United States Bankruptcy Court for the Northern District of Illinois. The proofs of claim were filed separately in each of the Petters-related cases, including that of PGW.[10] In an attachment to the proof of claim filed in PGW's case, Lancelot asserted that Thousand Lakes, LLC, one of the debtors in the Petters-related cases, was directly, contractually liable to Lancelot. Then, a claim against "each of the Debtors" in the Petters-related cases, including PGW, was asserted. Their liability was propounded under an allegation that "the Debtors may be jointly liable under an alter ego theory, or ... the Debtors [sic] estates should be substantively consolidated," or that each debtor was liable to the various Lancelot entities, "under a theory of civil conspiracy, as well as the contracts and agreements referenced herein ..." The stated total of the separate claims of the five Lancelot entities was $1,570,530,006.81.[11]

3. On April 22, 2009, Ritchie's counsel filed a document captioned as an objection to the Lancelot entities' filed claims. It contained only eight lines of actual text, but five lines' worth were only a recitation of the names of every single entity that made up the Ritchie and Lancelot entities. In its entirety, the only substantive recitation was: "Objectors submit that, among other reasons, these claims are not valid or allowable claims against this bankruptcy estate. Objectors reserve the right to supplement this Objection." There is no further indication in the text, as to the identity of the debtor identified to "this bankruptcy estate."

4. On June 1, 2009, Ritchie's attorneys filed another document in objection to the Lancelot entities' claims. In this one, Ritchie challenged the allowance of the Lan-

10. The names of the Lancelot entities suggest that they had been investment funds or other investment vehicles. (The full forms of name were noted earlier in the recitation of counsel's appearances.)

11. The Lancelot entities had filed for Chapter 7 relief, soon after the Petters-related cases were commenced. It was reported in the media that there was a causal link.

celot entities' claims against PGW, on the ground that, "unlike [their] contract claim[s] against PCI, [the Lancelot entities' claims against PGW] sound[ ] in fraud and [have] been asserted in conclusory fashion." Ritchie further "contend[ed] that PGW did not engage in any conspiracy that would provide Lancelot with an allowable claim against PGW, and therefore dispute[d] Lancelot's proofs of claim." This objection expressly challenged the Lancelot entities' qualification to vote under § 702(a)(1); it was expressly directed at the election dispute that was to be presented to the court later. Ritchie also asserted that the Lancelot entities had a materially adverse interest that disqualified them. The argument was that Lancelot's assertion of claims against PGW's estate under a theory of civil conspiracy between their own contractual debtor and PGW was an "attempt[ ] to satisfy [their] claims against PCI [sic] by invading the estate of another, ... imbu[ing] Lancelot with a material adverse interest to the true creditors of PGW."

### C.  True North Funding, LLC

1.  The debt schedules filed for PGW's case did not include an entry for a creditor named True North Funding, LLC ("True North").

2.  On April 21, 2009, a proof of claim with the "Name of Creditor" as "True North Funding, LLC" was filed. It was submitted by Marc A. Al, Esq., a Minneapolis-officed attorney. It was assigned no. 34 on the claims register maintained in BKY 08–45257, the case of PCI. The form's space for "Name of Debtor" was blank. It gave the amount of the claim as $10,800,000.00. As a "Basis for Claim," it recited only "See Attached Complaint (includes treble damages but not interest or

fees and costs)." The attachment was a 12–count complaint, 31 pages long, in a lawsuit venued in the United States District Court for this district. True North was one of three named plaintiffs and PGW and PCI were among seven named defendants.[12] The complaint attaches seven promissory notes, all executed in the name of PCI as obligor. In seven counts, it is asserted that PGW is liable to True North and the other plaintiffs on account of the debt under all of the notes. The pleaded theories range from fraudulent inducement, to civil conspiracy, to the Racketeer Influenced and Corrupt Organizations Act. The complaint identifies $3,600,000.00 as the amount of the lending that True North made to PCI.

### D.  Insight Partners LP

1.  The Schedule F filed for PGW's case included an entry for a creditor named Insight Partners LP. The amount of the claim was given as $667,000.00. The schedule identified the claim as "disputed."

2.  On December 24, 2008, Insight Partners LP filed a proof of claim in PGW's case. It asserted a claim in the amount of $667,000.00 against PGW for unpaid amounts owing under a contract for the provision of investment services. It also asserted liability in PCI and Thomas J. Petters individually.

3.  When the meeting of creditors was convened for election proceedings, no party in the case had filed an objection to Insight Partners' filed claim.

### E.  Interlachen Harriet Investments, Ltd.

1.  The debt schedules filed for PGW's case did not include an entry for a creditor

---

**12.** "John and Jane Doe" defendants, in number "1 through 10," were also included in the caption.

named Interlachen Harriet Investments, Ltd. ("Interlachen").

2. Interlachen had not filed a proof of claim in PGW's case by the time the meeting of creditors for election proceedings was convened.

### F. Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P.

1. The debt schedules filed for PGW's case did not include entries for claims in favor of the Palm Beach claimants.

2. On April 22, 2009, the Palm Beach claimants each filed proofs of claim in all of the Petters-related cases, including that of PGW. The total of the face amounts of the claims in PGW's case was $1,088,312,353.75. In an attachment to the proofs of claim, the Palm Beach claimants asserted that Debtor Palm Beach Finance Holdings, Inc. (identified as "formerly known as Petters Capital, Inc.") was directly, contractually liable to them for the full amount of the claims. They then asserted that PGW and the other debtors in the Petters-related cases were liable to them, stemming from the claimants' lending to Palm Beach Finance Holdings, Inc., under the theories of fraud and civil conspiracy.

3. When the meeting of creditors was convened for the election proceedings, Ritchie (and Lancelot) memorialized statements that purported to be objections to Palm Beach's claims.[13]

4. On June 1, 2009, Ritchie's attorneys filed a document that set forth an objection to the Palm Beach claimants' claims against PGW. The stated ground was that the Palm Beach claimants had "not articulate[d] what the 'fraud' or 'conspiracy' entailed, and [had] offer[ed] absolutely no facts, specifics, or any other basis to dem-

onstrate that PGW had a role in any fraud or conspiracy that provides Palm Beach with a valid and enforceable claim against PGW." Ritchie also "contend[ed] that PGW did not engage in any fraud or conspiracy that would provide Palm Beach with an allowable claim against PGW ..." In addition, it argued that the Palm Beach claimants had a materially adverse interest disqualifying them from voting for a trustee, on the same theory as Ritchie had argued against Lancelot.

### APPLICATION OF 11 U.S.C. § 702(a): QUALIFICATION TO VOTE

#### A. Ritchie

Between them, the U.S. Trustee and the Unsecured Creditors' Committee made three different arguments for their position that Ritchie was not qualified to vote for a trustee. Ritchie's counsel appeared to concede the point, in a remark made at the very end of his initial argument. Nonetheless, the issue should be addressed. As it turns out, two out of the three theories are flawed, but the soundness of the third is undeniable.

#### 1. Ritchie's Claims: Unsecured Versus Secured.

The U.S. Trustee was the sole proponent of the first theory. Its predicate assertion is that, "as a secured creditor, Ritchie is not entitled to participate in the election process since § 702(a)(1) specifically limits election participation to unsecured claims."

The statute does expressly limit the franchise in a trustee election to holders of unsecured claims. To deny Ritchie that status, the U.S. Trustee cites three points:

    a. Ritchie has filed proofs of claim in two of the Polaroid Corporation

---

**13.** A transcript of the meeting of creditors was not put into the record before the court; so the nature of the statements cannot be

clarified and a more precise legal characterization is not possible.

cases, asserting security interests in substantially all of those debtors' assets;

b. Four claims in favor of the Ritchie entities were listed in the Schedule D filed in PGW's case, and that placement tacitly classifies them as secured claims in that case;

c. Not long before the meeting of creditors in the PGW case, "Ritchie [had] held itself out as a secured creditor of PGW when it recently sought to intervene in the civil receivership proceeding" in the District Court.

■ The first point is so off-base that it is hard to come up with a simple explanation. Perhaps the easiest is just to state, "that's in the *Polaroid Corporation* cases, this is one of the *Petters-related cases,* and Ritchie does not assert a secured interest *in PGW's assets* in the proof of claim that it filed *in PGW's case."*

For his second point, the U.S. Trustee purports to rely on the deemed effect of documents filed in PGW's case. However, the argument does not have a very firm documentary basis for such a deeming. In a Chapter 11 case, "[a] proof of claim ... is deemed filed under [11 U.S.C. § ]501 ... for any claim ... that appears in the schedules filed under [11 U.S.C. §§ ]521(1) or 1106(a)(2) ..." 11 U.S.C. § 1111(a). Apparently, the U.S. Trustee relies on the thrust of this provision, plus the action of 11 U.S.C. § 502(a) ("a claim ... proof of which is filed under [11 U.S.C. § ]501 ... is deemed allowed ..."), to propel Ritchie's claim into an allowed, secured status for the present purposes. However, the closing phrase of § 1111(a) excludes "a claim ... that is scheduled as disputed, contingent, or unliquidated" from the deeming of "filed" (and thus allowed) status. The Schedule D in PGW's case categorizes the Ritchie claims as disputed and unliquidated.

And, ultimately, the actual content of the Schedule D entries for the Ritchie claims defeats any attribution of secured status *in PGW's case.* The entries acknowledge a claim of lien, but they then recite that the lien is against the assets of the Polaroid Corporation. The entries do not identify any assets of PGW pledged to Ritchie. So, there is just the bare presence of an entry for these claims on a Schedule D, rather than a Schedule F; nothing in the entries suggests the claim was secured by the assets of PGW prepetition. Imputing secured status to a claim from its mere presence on a schedule that is designated for secured claims would conclusively elevate a bare aspect of form over all apparent substance. That is particularly inappropriate because a claimant in a bankruptcy case almost never prepares debt schedules for the case, and thus has nothing to do with the placement.

■ The U.S. Trustee's third point is only a toss-off, in passing. The underlying thought seems to be judicial estoppel, or some variant of more general estoppel principles; Ritchie would be relegated to a status previously avowed in another court, from the fact of that avowal alone. To make out the alleged estoppel, there is one bare citation to one docket entry in the District Court's receivership proceeding. A document in which the position was allegedly taken is not even reproduced for the record here. Without some factual and legal development of the elements of judicial estoppel under applicable law,[14]

---

14. In *Hossaini v. Western Missouri Med. Ctr.,* 140 F.3d 1140 (8th Cir.1998), the Eighth Circuit noted that it had "not heretofore defined with precision the elements of the doctrine," of judicial estoppel, as between the majority and minority formulations from other courts. The Eighth Circuit has not enlarged on the holding in *Hossaini* since its issuance. *See*

this argument has no merit; it comes off like a snide accusation of inconsistency, with nothing specific from which the inconsistency could be identified.[15] It was a waste of time to even raise the argument.

### 2. Ritchie's Claims: Undisputed Versus Disputed.

■ The U.S. Trustee and the Committee both argued the second theory, which springs from the requirement of § 702(a)(1) that a voting creditor's claim be undisputed. They maintain that the document that the Committee filed on the eve of the meeting of creditors, captioned as an "Objection to Claims," makes the claims disputed, thus depriving Ritchie of qualification to vote.

This argument raises the issue of what makes a claim "undisputed" for the purposes of this statute: is it the filing of any document that challenges a creditor's qualification under § 702(a), or must it be an objection that would put the merits of the creditor's claim itself into dispute, i.e., an objection to the validity of the claim under the law that would govern the claimant's rights outside of bankruptcy? [16]

The Bankruptcy Code does not define the word "undisputed" at all, let alone in terms of the absence of such an objection or with reference to the initial establishment of an allowed claim under § 1111(a). However, the structure of § 702(a) and the common lexicon of the Bankruptcy Code evince Congress's intention to that effect. The premise of the U.S. Trustee's argument is contrary to those sources, which are consistent with one another. The bases for this construction are twofold and intertwined; one is structural, and the other definitional.

Structure first. Section 702(a)(1) sets up certain threshold requirements for qualification to vote. But, the framers of the Code segregated an additional requirement for qualification—lack of a materially adverse interest—into § 702(a)(2), cumulating it to § 702(a)(1). In application, § 702(a)(1) limits qualification to creditors that would not immediately be subject to claims-related litigation at the instance of a trustee, in the case going forward. (Logically, creditors without that exposure are less motivated to angle the seating of a trustee toward one of their unique choosing; those with it would be more motivated to promote their own interests as prospective respondents to such litigation.)

■ Then, a segue to definitions and the meaning of statutory terms of art. The limitation of § 702(a)(1) uses terminology from the Code's provisions for allowance of

---

*Little Rock Cardiology Clinic PA v. Baptist Health,* 591 F.3d 591, 601 n. 7 (8th Cir.2009); *Prudential Ins. Co. of America v. National Park Med. Ctr., Inc.,* 413 F.3d 897, 905 (8th Cir. 2005). *But see New Hampshire v. Maine,* 532 U.S. 742, 749–751, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (dicta) (summarizing various courts' formulations of elements of judicial estoppel).

**15.** The only specific holding on the nature of judicial estoppel in *Hossaini* is that the doctrine requires an "instance[ ] in which a party takes a position that is *clearly* inconsistent with its earlier position." 140 F.3d at 1143 (emphasis added).

**16.** This notion of the nature of a claim objection is reflected in the language of § 502(b)(1) that, after an objection to a claim is made, would require it to be allowed,

> except to the extent that—
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured ...

There are other bases on which to object to a claim under the other provisions of § 502(b), but this is the one most commonly invoked in estate administration. It is also the one that seems to go most directly to the conceptual basis for eligibility under § 702(a).

claims, e.g., 11 U.S.C. §§ 502(a)(1)-(2) (referring to claims being "allowed," "contingent" or "unmatured") and 502(c)(1) (referring to claims being "contingent" versus "fix[ed]" or "unliquidated" versus "liquidate[d]"). Absent textual distinction or an absurd result, the use of common terminology in different parts of a statute is to be assigned the same meaning, and is deemed to have the same points of reference. *E.g., LaRue v. DeWolff, Boberg & Assoc., Inc.,* 552 U.S. 248, 258, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) (the usual preference is for "construing the same terms to have the same meaning in different sections of the same statute") (citation and interior quotes omitted); *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (recognizing "basic canon of statutory construction that identical terms within an Act bear the same meaning"); *U.S. v. Kowal,* 527 F.3d 741, 747 (8th Cir.2008); *Flandreau Santee Sioux Tribe v. U.S.,* 197 F.3d 949, 952 (8th Cir.1999).

So, the notion of an "undisputed" claim under § 702(a)(1) is coeval with the notion of a claim that is not presently deprived of allowed status by the pendency of an objection under § 502(b)(1) to its merits or its allowance.

And back into structural considerations. The notion of "materially adverse interest" is separately placed in the statute; and the lack of such a disqualifying *interest* is separately prescribed for qualification to vote.

So, the only logical conclusion is that an objection to creditor qualification that is expressly founded on § 702(a)(2) alone does not, in itself, defeat the status of the underlying claim as "undisputed" within the meaning of § 702(a)(1). The pendency of a different sort of contested matter, a "claim objection" in the shorthand-parlance of bankruptcy practitioners, would have been required to defeat Ritchie's standing on that count. In its "objection" the Committee did not voice anything to dispute the legal or factual merits of Ritchie's claims under nonbankruptcy law, in the sense of an objection pursuant to 11 U.S.C. § 502(b)(1). Nor did it raise any other impediment to allowance under § 502(b). The Committee candidly acknowledged that.

No other objection to Ritchie's claim, sounding under § 502(b), was on file when the meeting of creditors was convened. So, Ritchie's claim was not deprived of undisputed status by the Committee's filing.

### 3. Ritchie's Interest: Not Materially Adverse Versus Materially Adverse.

■ However, the third point raised by the U.S. Trustee and the Committee is decisive. Given its respective positions in PGW's case and the Polaroid Corporation cases, Ritchie has "an interest materially adverse ... to the interest of creditors entitled to [a] distribution" from the PGW estate, and it is disqualified from voting by § 702(a)(2).

The reason is that Ritchie holds security interests in the assets of the estate of the Polaroid Corporation, and is tenaciously defending them. Were Ritchie to realize on these secured positions, it would receive tens of millions of dollars out of that bankruptcy estate.[17] The trustee in the Polar-

---

17. Ritchie claims a lien in "substantially all" of the Polaroid Corporation's assets and their proceeds. It has a competitor in its secured claims, in another party to the Polaroid Corporation cases, Acorn Capital Group, LLC. During the months preceding the collapse of Tom Petters's business structure, both of these constituencies received liens in the assets of the Polaroid Corporation, and Acorn received liens in the assets of another debtor in the Polaroid Corporation cases.

oid Corporation's case is prosecuting an adversary proceeding against Ritchie. That litigation portends to be involved. Ritchie is zealously defending it. If the Polaroid Corporation trustee is successful, the value in the estate of Polaroid Corporation would be freed up for distribution to that debtor's unsecured creditors (assuming no secured claims in favor of other creditors). Any residuum after satisfaction of all allowed claims would go to the holders of the Polaroid Corporation's equity.

The interests of PGW's creditors, other than Ritchie, are directly and crucially implicated at either level of distribution in the Polaroid Corporation's case. PGW's estate has asserted unsecured claims in the Polaroid Corporation's case. Were that estate's monies freed of Ritchie's liens, PGW's estate could receive a distribution as an unsecured creditor. And if the administration in the Polaroid Corporation's case resulted in a surplus payable to equity interests, PGW would ultimately receive the value of that residuum via an upstreaming through the intermediate holding company or companies.[18] These funds would then be administered by PGW's trustee, via distribution to PGW's creditors.

So under either outcome of the administration of the Polaroid Corporation's estate, i.e., insolvency or the generation of a surplus for equity, the interests of PGW's other unsecured creditors are directly ("materially") aligned against ("adverse" to) Ritchie's interests, and vice versa. Ritchie, in opposing the Polaroid Corporation trustee, is pursuing its own separate recoveries from the estate in that case, in com-

petition with the PGW estate as a creditor there, in "the classic pattern of material adversity." *In re Klein*, 119 B.R. 971, 974–975 (Bankr.N.D.Ill.1990). Its strategy and goals in that case are completely of a piece with its game plan in PGW's case. As a result, Ritchie is not qualified to vote for a trustee in PGW's case.

### B. Lancelot

As part of its motion, Ritchie challenged the qualification of the Lancelot entities' bankruptcy estates to vote. It invokes both §§ 702(a)(1) and 702(a)(2).

### 1. Lancelot's Claims: Undisputed Versus Disputed.

Ritchie insists that Lancelot's claims were not undisputed, as required by § 702(a)(1).

As noted previously, the status of a claim as undisputed or disputed for the purposes of § 702(a) turns on the presence in the court's file of an objectively-manifested, bona fide controversy over liability on the claim that has been memorialized in writing, i.e., via schedule entry or formal claim objection. This case presents the complication that Ritchie put two such memorializations in the record. One is terse and virtually opaque; the other is somewhat more developed. To further complicate things, the two span the actual event of the election proceedings: one was filed minutes before the meeting of creditors was convened, and the other was filed over two months later. The conundrum of what to consider in determining a claim's status as disputed under circumstances like these is resolved by a nice, simply-articulated, fixed-point rule: "The proper time to de-

---

**18.** At least two iterations of an "org chart" for Tom Petters's business structure have been put before the court in the Petters-related cases. None are in the record for the present matter; but it is not disputed at this time that the line of a hierarchy of equity holdings from the Polaroid Corporation would end up in PGW. Any intermediate holding companies are not in bankruptcy at present, but they are subject to the District Court's receivership.

termine the universe of creditors entitled to vote to elect a ... trustee is as of the time of the election." *In re Amherst Technologies, LLC,* 335 B.R. 502, 512 (Bankr. D.N.H.2006); *In re Williams,* 277 B.R. 114, 117 (Bankr.C.D.Cal.2002); *In re Aspen Marine Group, Inc.,* 189 B.R. 859, 863 (Bankr.S.D.Fla.1995).

■ When the record for consideration is locked thus, at its state on April 22, 2009, it is clear that Lancelot was not disqualified from voting; Ritchie's filing of a fleeting, opaque, and conclusory statement in denial was not effective to make Lancelot's claims disputed.

■ To expand: the filing of Lancelot's proofs of claim in PGW's case was sufficient, in itself, to make out a prima facie case as to the validity and amount of claims allowable in its favor in that case. FED. R. BANK. P. 3001(f); *In re Gran,* 964 F.2d 822, 827 (8th Cir.1992). To shift a claim evidenced that way from the status of deemed allowance toward a determination based on actual legal viability, an objection must be filed. 11 U.S.C. § 502(a); FED. R. BANK. P. 3007(a). When an objection to a claim is filed for the purposes of challenging the claimant's qualification under § 702(a) to vote, "it is incumbent upon the objecting party to present facts from which the court can reasonably conclude that ... the objecting party could present evidence of equal probative force to that of the creditor's claim." *In re Poage,* 92 B.R. 659, 665 (Bankr.N.D.Tex.1988).

Ritchie's filing on April 22, 2009 did not make a single fact averment to challenge the deemed showing of prima facie evidence, that PGW was liable to the Lancelot entities' bankruptcy estates in tort—civil conspiracy and fraud—and hence was indebted to them. Under the authorities just cited, Ritchie's terse filing, made just before the meeting of creditors, did not render Lancelot's claims disputed.

■ Ritchie's rejoinder to this only shunts the analysis toward a side-issue. Contrary to its argument, the filing that its attorneys made on June 1, 2009, weeks later and with the benefit of hindsight and reflection, is irrelevant; its points were not raised until long after the crucial date as of which status was to be determined.

Further, the totality of the circumstances does not make such a holding unjust. Ritchie claims to have been blindsided by Lancelot's filing its proofs of claim a day before the meeting of creditors; but the protest is vitiated by the months of history before then. Lancelot's bankruptcy trustee had been involved in the Petters-related cases for several months. He had made it clear that he would seek all available financial recourse for his estates, within the Petters-related cases. Obviously one of his options was to assert claims against the estates in all of those cases. More to the point, Ritchie had set in motion the machinery for a trustee election in mid-December; but it had neglected to take one eminently reasonable expedient for it, moving for a procedures order that would fix an interim deadline for the filing of proofs of claim. The establishment of such a deadline would have had a salutary function in the election process, particularly for establishing qualification and entitlement to vote.[19] The filing of tort-based

---

19. The expedient would have shunted off just the sort of vexing disputes as are here presented. Ritchie cites *In re Sforza,* 174 B.R. 656 (Bankr.D.Mass.1994), to get around the point, but the long lag time in Ritchie's actions distinguishes this case from *Sforza.*

*Sforza* was a Chapter 7 case. In it, the creditor sought to have a trustee election conducted at the initial meeting of creditors; the creditor filed a proof of claim "only minutes" before the meeting of creditors was convened; the debtor objected on the record then, that

claims against PGW based on joint and several liability with the other debtors in the Petters-related cases was foreseeable; Ritchie cannot credibly deny that. In any case, Ritchie could have prevented a last-minute influx of such claimants from interfering with an election process, by seeking a more structured pre-election process under judicial order.

So, Lancelot's claims are undisputed, for the purposes of § 702(a)(1). It is not disqualified from voting for failure to meet that requirement.

### 2. Lancelot's Interests: Not Materially Adverse Versus Materially Adverse.

Ritchie levies the charge of having a materially adverse interest, toward denying Lancelot qualification under § 702(a)(2). The insinuation is that Lancelot is trying to loot the PGW bankruptcy estate under color of stretched, spurious claims under tort law, when it had never lent to PGW or been in contractual privity with it. This, Ritchie argues, places Lancelot's interests at odds with the interests of creditors that hold claims founded on contractual, loan-based relationships with PGW. (Ritchie, of course, puts itself in the latter class, of the "true creditors" of PGW.)

The determination of a materially adverse interest under § 702(a)(2) is made on a case-by-case basis, taking into account the competing factors. *In re Cohoes Indus. Terminal, Inc.*, 90 B.R. 67, 70 (S.D.N.Y.1988); *In re NNLC Corp.*, 96 B.R. 7, 10 (Bankr.D.Conn.1989). The comparison is between the nature, magnitude, and degree of the subject creditor's interest, and the interests of the general body of unsecured creditors. Obviously, the subject creditor's interests must be examined more closely when the nature of its claim or the incidents of its broader position in the case are more fundamentally different from those of more "typical" claims.

Ultimately, the concern is whether the subject creditor has ulterior motives for its participation in an election process, that may manifest themselves in unfairly self-serving ways if the subject's vote is pivotal in the choice of a trustee and could result in turn in a distortion or subversion of the administrative process post-election. *See In re Amherst Technologies, LLC*, 335 B.R. at 508 (analysis of "materially adverse interest" implicates general concept of conflict of interest on part of subject creditor, as against general interest of unsecured creditors in neutral, even-handed, but zealous administration of estate). The outcome of a judicial determination on this issue should reinforce the actual integrity and apparent legitimacy of trustees' administration.

Here, if any position was inordinately self-serving on the matter of Lancelot's status under § 702(a)(2), it is Ritchie's. Lancelot asserts its contractually-based claims against a different debtor or debtors in the Petters-related cases; but given the well-publicized, complex backdrop of these cases, Lancelot's bankruptcy trustee cannot be faulted for asserting a tort-based claim against PGW that is premised on allegations of a fraud-driven conspiracy among all of the debtors in them. A claim arising out of tortious behavior in a commercial context is no less

---

the creditor's claim was disputed; and, crucially, the creditor and the debtor had been involved in lengthy, unresolved litigation in the state court before the debtor's bankruptcy filing. The *Sforza* court granted a dispensa-

tion for the debtor from the formal requirements to render the creditor's claim disputed, and denied the creditor qualification to vote. Almost none of the factors that that court used to justify its result are present here.

amenable to allowance in the bankruptcy case of any of the tortfeasors, than is a direct, contractual claim arising out of unpaid debt owing by a lender.[20]

Ritchie clearly fears that the allowance of Lancelot's tort-based claims against PGW would dilute a distribution to all of PGW's other unsecured creditors. To the extent that there is adversity arising out of such a variance, it is "inherent to the creditors of any insolvent entity." *In re Cohoes Indus. Terminal, Inc.,* 90 B.R. at 70. Lancelot's bankruptcy estates have the right to recover on their claims against the estate of any of the Petters-related debtors that would be legally liable to them, if their trustee proves the accusations of fraud and conspiracy. When they do so, their interests are no more materially adverse to the general interests of PGW's creditors, than would be the interests of a creditor on another unpaid loan that happens to be very large in outstanding balance.[21] In sum, Lancelot is not rendered ineligible to vote for a trustee for a failure to meet § 702(a)(2).

### C. True North Funding, LLC

▮ In his report, the U.S. Trustee chose to classify True North Funding, LLC as unqualified under § 702(a), as to an election to be conducted in PGW's case. The stated reason is:

> True North filed a proof of claim for $10,800,000.00 in PCI. True North did not file a proof claim [sic] in PGW, nor is True North listed as a creditor on PGW's Schedule F. Because True North does not have an allowed claim in PGW, it is not entitled to vote in the election.

It was not unreasonable for the U.S. Trustee to point to the anomalous status of the record for assertion of claims. True North's counsel, Mark A. Al, had created that anomaly via the content and structure of the proof of claim he presented and the way in which he filed it.

The top of the form for a proof of claim has a blank for "Name of Debtor." Its purpose is self-evident: to fix the identity of the case and estate to which the claim is relevant. Before the advent of electronic-format filing under CM/ECF, the completed content of that blank was a critical cue to court personnel, as to the case in which the claim was to be registered. Even under direct filing by outside users of CM/ECF, it still serves to resolve potential disputes where the filer misdirects the proof of claim to the wrong case. The failure to take heed of this is particularly nettlesome where it occurs in jointly-administered, multiple cases that involve related debtors. The resultant confusion is obvious, as here, and there is real potential for legal prejudice.

Worse yet here, True North's counsel admitted that the omission was deliberate. The thought apparently was that the attachment of his client's civil complaint would automatically incorporate the names of all of its defendants who were also Petters-related debtors into the body of the proof of claim where appropriate, so as to make its filing the assertion of a claim in the cases of all of those debtors. He states that he filed a proof of claim in the case of PCI alone because an employee of the clerk of bankruptcy court instructed so, upon his query.

**20.** As the Lancelot trustee pointed out, the concept of "provability" of claims as a prerequisite of allowance was abrogated by the 1978 repeal of the Bankruptcy Act of 1898; and after that, claims sounding in tort and "commercial," contractually-based claims based on lending were put on equal footing for allowance in a bankruptcy case.

**21.** One could use the very same words to describe the relationship of Ritchie's unsecured claims to those of PGW's unsatisfied trade creditors.

A party's assertion of the latter sort of reliance is especially annoying when it is injected into a proceeding requiring a judicial determination.[22] Further, counsel's thought of identifying the subject cases by names buried in an attachment outside the four corners of the claim form was idiosyncratic, and not completely logical. Not everyone would go through the several levels of inference assumed by True North's counsel, to get to the conclusion that claims were being asserted against all of the defendants named in that attached document who also happened to be debtors in the Petters-related cases. And, given the simplicity of doing it the correct way, no one should have to do so.

However, the order for joint administration in the Petters-related cases (Dkt. No. 21, entered October 22, 2008) had no directive as to the filing of proofs of claim. That was deliberate. At that time, early in these cases, there was a powerful prospect of creditor confusion in the wake of allegations that there had been massive commingling of assets and cross-running liabilities among multiple debtor-entities. So, the idea shared by the debtors' counsel, the court (including the clerk), and the U.S. Trustee was to take proofs of claim as filed electronically, in whatever case they were placed by the filers, and sort them out when appropriate. The poorly-conceived form of submission from attorney

Al was not among those in contemplation; but the order for joint administration did not even give notice that separate claims registers would be maintained, let alone direct a segregated filing of all proofs of claim.

Apparently, counsel was broadly relying on the dictate of Term 2 of the order, "Only one copy of all further documents need be filed, and all documents shall be filed and docketed in the case of Petters Company, Inc., BKY 08–45257." To be entirely fair to him, that reliance did not lack all foundation. Since True North's proof of claim was filed in a way not inconsistent with that term, the incorporation-by-reference from the civil complaint should be given deference in the present context. The result is consistent with the philosophy for the treatment of proofs of claim that was behind the order for joint administration.

Thus, for the present purposes, True North must be deemed to have filed a proof of claim in PGW's case as well as PCI's.[23] Because the claim was not formally disputed when the meeting of creditors was convened, True North has to be considered qualified under § 702(a) for the purposes of the election proceedings in PGW's case.

### D. Insight Partners LP

There is no dispute that this creditor is qualified to vote in an election for trustee in PGW's case.

---

22. There is often no way to corroborate such a statement from counsel. (The clerk's office can get hundreds of phone calls per day, and busy employees do not have perfect memory; is the judge somehow to put court employees under oath and to subject them to interrogation on such an issue?) And, it flies in the face of a common-sense, simple conclusion as to the best proactive way to ensure that one's client is fully protected. Counsel for several other claimants that asserted common liability in the Petters-related debtors filed separate proofs of claim with the same operative text in multiple cases, using multiple debtors'

names in a single version or creating variant proofs of claim differing in the name alone. This is all quite easy when using the medium of electronic format.

23. The effect of this ruling is limited to the contested matter at bar, i.e., a disputed trustee election. It will not be given collateral effect for any other purpose in any of the Petters-related cases, particularly against parties that were not actively involved in the contested matter at bar.

### E. Interlachen Harriet Investments, Ltd.

■ It is manifest that Interlachen was not qualified to participate in the election process, even though its representative appeared at the meeting of creditors. For a party to meet the threshold requirement of having an "allowable" claim within the meaning of § 702(a)(1), there must be a written memorialization to stake out the claim within the case, via an entry on a filed schedule or the filing of a proof of claim. *In re San Diego Symphony Orchestra Ass'n*, 201 B.R. 978, 981 (Bankr. S.D.Cal.1996); *In re Michelex Ltd.*, 195 B.R. 993, 1006 (Bankr.W.D.Mich.1996). When the meeting of creditors was convened, Interlachen had neither of these. Its representative expressed a wish to assert a claim on the record at the meeting of creditors, but that was irrelevant.[24] So, too, was the announcement of its wishes in regards to its vote.

### F. Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P.

The authorities and analysis for Lancelot's eligibility apply with equal strength to the situation of the Palm Beach claimants. The result is reinforced by the one historical feature that distinguishes the Palm Beach claimants' posture from Lancelot's. When the meeting of creditors was convened, there was not even a formal objection to their claims on file in PGW's case. The status of these claims as subject to dispute is locked in as of then. They were not disputed of record at the time. Thus, the Palm Beach claimants were qualified to vote in this election.[25]

### APPLICATION OF 11 U.S.C. § 702(b): CALLING OF ELECTION

As it turns out, this contested trustee election comes down to whether the election was properly called in the first place. Technically phrased, the question is whether § 702(b) was satisfied, i.e., whether the requisite fraction of the statutorily-specified creditor constituency requested an election. This is a matter of quantification, applied after legal determinations as to qualification for participation in voting.

Under § 702(b), the first point to quantify is the aggregate "amount of the claims specified in [§ 702](a)(1) ... that are held by creditors that may vote under [§ 702](a) ..." The authors of published decisions on the bankruptcy court level tend to call this the "universe of creditors" for a trustee election. E.g., *In re San Diego Symphony Orchestra Ass'n*, 201 B.R. at 981 (referring to "the base or universe of creditors who are authorized to vote ...").

■ As noted earlier, the reference point for creditors' status within or without the "universe" is the time of the election procedure. *In re Amherst Technologies, LLC*, 335 B.R. at 512. The first step is to identify all of the creditors "that may vote under [§ 702](a)," toward calculating the total amount of claim value that is the base figure for the requesting quorum. The claims of those facial characteristics that were originally listed in the schedules for the case, even if their holders had not filed a proof of claim by the convening of the election process, are to be added to the claims asserted under undisputed filed

---

**24.** If both wishes were tallied in, though, they would support today's result.

**25.** Since the relevant time for determination is then, the claim objection that Ritchie generated and filed weeks later is irrelevant. If it had to be considered as timely, the latter part of the analysis for Lancelot's claims applies here as well; an objection as vaguely-phrased as Ritchie's would not be effective to make the claims disputed for the purposes of § 702(a)(1).

proofs of claim. This approach is the appropriate one, more properly structured by the notion of an "allowable, undisputed, fixed, liquidated, unsecured claim" under § 702(a)(1). *E.g., In re San Diego Symphony Orchestra Ass'n,* 201 B.R. at 981; *In re Michelex Ltd.,* 195 B.R. at 999. *Contra, In re Lake States Commodities, Inc.,* 173 B.R. 642, 646 (Bankr.N.D.Ill.1994) (holding that only creditors that have filed proofs of claim by the convening of the election are part of the "universe").

Under the rulings in this order, one subgroup of such creditors (those that had filed proofs of claim in PGW's case) and the relevant amounts of the claims associated with them is as follows:

| | |
|---|---|
| Insight Partners | $ 667,000.00 |
| Lancelot entities | $1,570,530,006.81 |
| Palm Beach claimants | $1,088,312,353.75 |
| True North | $ 10,800,000.00 |
| SUBTOTAL: | $2,670,309,360.56 |

Then, there are two multi-member groupings of claimants qualified to vote under § 702(a), though they did not come forward on Ritchie's summoning:

| | |
|---|---|
| Creditors under other filed proofs of claim | $ 12,669.94 |
| Other claims listed on Debtor's Schedule F under notations that meet § 702(a) (no proofs of claim on file) | $519,737.95 |
| SUBTOTAL: | $532,407.89[26] |

Then there is one last constituency, as to which there is a controversy. Creditors named Sun Minnesota Foreign Holdings, LLC and Sun Minnesota Domestic Holdings, LLC (collectively, "Sun Minnesota") filed two proofs of claim in PGW's case, nos. 21–1 and 22–1. Under claim no. 21–1, Sun Minnesota asserts liability in PGW under PGW's "deficiency guaranty" of a debt owing to Sun Minnesota by Petters Aviation, LLC. Under claim no. 22–1, Sun Minnesota asserts liability in PGW under PGW's "limited guaranty" of a debt owing to Sun Minnesota by MN Airlines, LLC, dba Sun Country.

Ritchie argues that the source of PGW's liability on these claims—guaranties of third-party debt—makes them "contingent," hence not "fixed," and "unliquidated" rather than "liquidated," which would disqualify the claims under § 702(a)(1). Thus, as Ritchie would have it, the Sun Minnesota claims are not to be factored into the "universe" for the determination of a requesting quorum.

■ Ritchie cites *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.,* 452 F.3d 494, 499 (6th Cir.2006), for the proposition that:

> ... guaranties, by their very nature, are conditional promises to pay because guarantors promise to pay only on the condition that the principal debtor fails to pay ... [and] do not involve a sum certain because the amount of the guarantor's liability cannot be determined solely from the instrument itself without reference to an outside source.

In rejoinder, the Unsecured Creditors' Committee argued that Ritchie erred by not taking Minnesota law into account. The Committee was well-put to make this argument; the guaranty behind claim no. 21–1 expressly makes Minnesota state law applicable to it. The guaranty underlying claim no. 22–1 is silent as to choice of law, and Ritchie failed to argue for legal governance from another forum after the Committee urged the application of Minnesota case precedent. This leaves Minnesota law as the most appropriate governance. *Nodak Mutual Ins. Co. v. Am. Family Mut. Ins. Co.,* 604 N.W.2d 91, 93–94 (Minn.

---

**26.** The identity of the individual creditors in each of these two groupings is not in dispute among the contending parties; nor is the amount of their claims. Thus, further detail is not given here.

2000) (choice-of-law analysis is necessary only if there is a conflict of laws, i.e., a difference in governing rule that would be outcome-determinative) and *Jarvis & Sons, Inc. v. Int'l Marine Underwriters,* 768 N.W.2d 365, 370 n. 2 (Minn.Ct.App. 2009) (in absence of a contractual choice of law provision, Minnesota law will govern where conflict of law issue is not raised by a party).[27]

■■■■■ Under Minnesota law, a "guaranty is absolute and one of payment unless it is by its terms made conditional." *Holbert v. Wermerskirchen,* 210 Minn. 119, 297 N.W. 327, 328 (1941) (citations omitted). Though "parties are at liberty to contract for an absolute or conditional guaranty," "an unconditional guaranty of payment becomes absolutely liable ... upon default of the maker without any obligation on the transferee's part to exhaust available legal remedies to collect the note against the maker." *Id.* *See also, Dresser v. North Star World's Fair Corp.,* 289 Minn. 530, 185 N.W.2d 284, 285 (1971).

The application of these principles divides the blanket, as to Sun Minnesota's claims factoring into the "universe." Claim no. 21–1 is premised on a "deficiency guaranty," granted under terms that require Sun Minnesota to foreclose on liens against certain securities before it can satisfy any deficiency by enforcing the guaranty. This had not happened by the time the meeting of creditors was convened here; so this claim was contingent

and unliquidated on the defining date. Claim no. 22–1 has no such contingencies, however; so it is absolute and presently enforceable against PGW. It factors into the universe, in its face amount of $13,653,616.70.

The total of the claims base for determining a requesting quorum is $2,684,495,385.15. Twenty percent of that, the minimum value-amount for a requesting quorum under § 702(b), is $536,899,077.03.

■■■ When the election proceedings convened here, only two of the qualified creditors or creditor groups actually requested an election for a trustee: Insight Partners and Ritchie. All of the other creditors and creditor groups that appeared—Lancelot, True North, Interlachen, and the Palm Beach claimants—expressly opposed an election, as their first line of response to Ritchie's effort.[28] No other creditors expressed a position as to calling an election.

Ritchie was not qualified to vote under § 702(a). This left the claim of Insight Partners as the only value-input toward the 20% threshold. Its amount—$667,000.00—was far short of the threshold amount ($536,899,077.03).

## OUTCOME

An election for a trustee was requested in PGW's case. The requesting parties did not meet the requirements of § 702(b), so as to require that a binding election be

---

**27.** In any event, the Tennessee state law on which the *Max Arnold & Sons* court based its ruling has no applicability at all here. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971) (rights and duties as to an issue in contract are determined by local law of the state that, as to that issue, has the most significant relationship to the transaction and the parties). Here, as much as can be determined from the guaranty and its context, all

of the parties to the second Sun Minnesota guaranty had their strongest connections with the State of Minnesota, and there is no apparent connection between any of them and the State of Tennessee.

**28.** As their second line of response, they unanimously opposed electing Moratzka as trustee.

actually convened. No election took place at the special meeting of creditors. As a result, the trustee whose appointment was approved on February 26, 2009, was not displaced.

## ORDER

IT IS HEREBY ORDERED AND DETERMINED:

1. Timothy D. Moratzka, Esq., shall not take the position of trustee in the case of Debtor Petters Group Worldwide, LLC.

2. Douglas A. Kelley, Esq., remains the trustee of Debtor Petters Group Worldwide, LLC.